Michael M. WITTORF, R.N., Petitioner

v.

STATE BOARD OF NURSING,
Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2006.
Decided Oct. 12, 2006.
Publication Ordered Jan. 10, 2007.

Joseph T. Bambrick, Jr., West Reading, for petitioner.

Thomas A. Blackburn, Asst. Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, LEADBETTER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Michael Wittorf (Wittorf) petitions this Court for review of the State Board of Nursing's (Board) suspension of his license to practice nursing for violating a Voluntary Rehabilitation Program (VRP) consent agreement (VRP Agreement) requiring him to abstain from alcohol and by failing to submit the required support group meeting verifications pursuant to the Professional Nursing Law (Law).[1]

_____

1. Act of May 22, 1951, P.L. 317, *as amended,* 63 P.S. §§ 211–225.5.

On December 1, 2000, Wittorf was arrested for Driving under the Influence of Alcohol (DUI), 75 Pa.C.S. § 3731(a) (revised now at § 3802(a)), a second class misdemeanor. *See* 75 Pa.C.S. § 3803(a)(2). Wittorf subsequently entered into the Berks County Accelerated Rehabilitation Disposition (ARD) program on the condition he receive counseling services. As result of successfully completing the ARD program, Wittorf's record was expunged.

Presumably, his entry into the ARD program brought him to the attention of the Pennsylvania Department of State's Bureau of Professional and Occupational Affairs (Bureau). By letter dated September 25, 2002, the prosecutor in the Bureau offered Wittorf an opportunity to accept the VRP before public disciplinary proceedings would be taken against him. Wittorf agreed to accept entry into the VRP in lieu of disciplinary charges being brought. On February 14, 2003, the Board issued an order adopting the VRP Agreement entered into between the Bureau and Wittorf.

In the VRP Agreement, Wittorf stipulated that he was unable to practice the profession of nursing with reasonable skill and safety to patients due to his chemical abuse or dependency, specifically to alcohol. (Paragraph 7(a) of the VRP Agreement.) In the VRP Agreement, Wittorf admitted that he had suffered from alcohol abuse or dependency since November 2000, and he had received counseling from December 29, 2000, until March 21, 2001. (Paragraph 3(c) and (e) of the VRP Agreement.)

Under the VRP Agreement, Wittorf's license was suspended for three years with the suspension immediately stayed in favor of probation provided that he:

- "completely abstain from the use of controlled substances, mood altering drugs or drugs of abuse including alcohol in any form," unless prescribed by a licensed health care practitioner who was aware of Wittorf's impairment and participation in the VRP (Paragraph 7(d)(19)(a)-(c) of the VRP Agreement);
- cooperate with the agents of the Professional Health Monitoring Program (PHMP) of the Bureau, who serve as case managers of the VRP, including submitting all reports required under the agreement to the PHMP (Paragraph 7(d)(1) and (30) of the VRP Agreement);
- attend and actively participate in support group programs at least twice per week and submit written verification of any and all support group attendance to the PHMP on at least a monthly basis (Paragraph 7(d)(17)-(18) of the VRP Agreement);
- submit to random, unannounced and observed body fluid toxicology screens (ROBS) to test for the presence of prohibited substances, including alcohol (Paragraph 7(d)(28) of the VRP Agreement); and
- not work without the PHMP case manager's written approval for a period of at least six months; following return to work, practice the profession in any capacity that involves the administration of controlled substances; function as a supervisor; function in a private practice setting or without direct supervision; work in an intensive care unit, operating room, coronary care unit, or emergency department; or function as an agency nurse (Paragraph 7(d)(22)(a)-(e) of the VRP Agreement).[2]

---

**2.** Wittorf was subject to these restrictions from the date the VRP Agreement was adopted by the Board, February 14, 2003, until May 14, 2003, when Wittorf's VRP case manager gave him written permission to work without these restrictions.

The Board agreed to give Wittorf credit for his previous treatment from December 29, 2000, to March 21, 2001, (Paragraph 7(i) of the VRP Agreement) meaning that his probationary period would end on December 29, 2003, a 10–month period, after which Wittorf could petition the Board for reinstatement.

Wittorf tested positive for alcohol in July and September, 2003, and failed to submit to the required drug screens. Because of these violations, on March 7, 2004, Wittorf agreed to extend his VRP probationary period until March 10, 2007. Nonetheless, Wittorf continued to violate the VRP Agreement. He failed to submit support group attendance records as required by the VRP as of October 2003; urine samples submitted on May 14, 2004 and July 13, 2004, tested positive for alcohol; he failed to respond to repeated case manager requests for an explanation of failed alcohol tests; and he failed to provide records from counseling sessions.

On October 26, 2004, a prosecuting attorney for the Bureau filed a petition seeking to suspend Wittorf's license alleging: (1) Wittorf violated the VRP Agreement by failing to abstain from alcohol as shown by testing positive in his May 14, 2004 and July 13, 2004 screens; (2) Wittorf failed to cooperate with PHMP by failing to provide a complete explanation for his positive test results when requested in September 2004; (3) Wittorf failed to provide PHMP with documentation showing attendance at support group meetings after November, 2003; and (4) Wittorf failed to have written treatment reports submitted to PHMP after July, 2004. The Board's Probable Cause Screening Committee found that probable cause existed to believe that Wittorf had violated the terms of the VRP Agreement as alleged and issued a preliminary order vacating the previously imposed stay of suspension and actively suspended Wittorf's license. On November 22, 2004, Wittorf filed an Answer to the petition and requested a hearing.

Before a Hearing Examiner, Wittorf did not dispute that he breached the VRP Agreement. Instead, he argued that the Board had no authority to force him to enter into the VRP Agreement because he had only been charged, not convicted of a second degree misdemeanor, and the Board only had the ability to take disciplinary action under Section 14(a)(5) of the Law, 63 P.S. § 224(a)(5), if the offense was a felony. He also argued that despite his use of alcohol, he could safely practice nursing. In support of the latter, Wittorf presented:

- Brenda Brensinger (Brensinger) who testified that she was a secretary at the Reading Hospital and knew Wittorf because he worked as a charge nurse in the cardiac unit where she worked. She also testified that she observed Wittorf in his professional capacity every day, observed him working with co-workers and patients, and concluded that Wittorf was an excellent nurse who gave patients "adequate care." On cross-examination, Brensinger testified that she could not recall a time when Wittorf was restricted from handling medications.
- William Jeter (Jeter), a certified addictions counselor, who testified that he first met Wittorf when he participated in court-ordered counseling for three months from December 29, 2000, until March 21, 2001. Jeter testified that the next contact he had with Wittorf was on March 11, 2004, when he resumed treating him. Jeter opined that Wittorf was not impaired and could safely practice nursing. But on cross-examination, Jeter admitted that Wittorf did not tell him that he admitted to his case manager that he drank alcohol in July and September 2003, in violation of his VRP

Agreement or that his VRP Agreement was initially for only a 10–month period, but was extended due to his relapses in July and September 2003. Jeter also testified that Wittorf told him that he had been abstinent since 2000.

- Marshal Feaster, M.D. (Dr. Feaster), a cardiac surgeon who testified that he had contact with Wittorf for three years and that Wittorf had not shown any impaired judgment or coordination. On cross-examination, Dr. Feaster was not aware that Wittorf's license was subject to a VRP Agreement based on Wittorf's admission that he was unable to safely practice nursing due to dependence on alcohol.

- Jill Auchenbach, L.P.N. and Louise Potteiger, R.N., both of whom testified that Wittorf had not shown any impaired judgment or coordination when treating patients. However, both were unaware that his practice had been restricted.

On June 17, 2005, the Hearing Examiner issued a proposed adjudication finding that Wittorf violated the VRP Agreement and proposed suspending Wittorf's license for three years, retroactive to October 26, 2004. Wittorf filed exceptions to the Hearing Examiner's proposed adjudication and order arguing that the Bureau did not

have the authority to force him to enter into the VRP Agreement.

On January 26, 2006, the Board found Wittorf had failed to comply with the terms of the VRP Agreement by failing to abstain from alcohol and by failing to submit, on a monthly basis, verification that he attended mandatory support group meetings. The Board also ruled that the witnesses that testified on Wittorf's behalf were not credible. As a result, the Board imposed a 3–year active suspension of Wittorf's license as set forth in the VRP Agreement retroactive to October 26, 2004. This appeal followed.[3]

■ Wittorf first contends that the Board exceeded its legislative authority when it entered an order approving the VRP Agreement on February 14, 2003, because he had only been charged and not convicted of a second degree misdemeanor as opposed to a felony as Section 14(a)(5) of the Law,[4] 63 P.S. § 224(a)(5), requires. However, while the criminal charges may have brought Wittorf to the attention of the Bureau, the VRP Agreement was entered pursuant to Sections 14(a)(2) and (b)(4) of the Act. 63 P.S. § 224(a)(2) and (b)(4).[5] Those provisions give the Board

---

**3.** Our scope of review of Board decisions is limited to determining whether the Board committed constitutional violations, errors of law or whether any necessary findings of fact are unsupported by substantial evidence. *Stephens v. Pennsylvania State Board of Nursing,* 657 A.2d 71 (Pa.Cmwlth.1995).

**4.** Section 14(a)(5) of the Law states as follows:

(a) The Board may refuse, suspend or revoke any license in any case where the Board shall find that—
* * *
(5) The licensee has been convicted, or has pleaded guilty, or entered a plea of nolo contendere, or has been found guilty by a judge or jury, of a felony or a crime of moral turpitude, or has received probation

without verdict, disposition in lieu of trial or *an Accelerated Rehabilitative Disposition in the disposition of felony charges,* in the courts of this Commonwealth, the United States or any other state, territory, possession or country. (Emphasis added.)

**5.** Paragraph 7(a)-(b) of the VRP Agreement states:

7. The parties consent to the issuance of the following Order in settlement of this matter:
a. The Board is authorized to suspend, revoke or otherwise restrict [Wittorf's] license under 63 P.S. § 224(a)(2) in that [Wittorf] is unable to practice the profession with reasonable skill and safety to patients by reason of illness, addiction to drugs or alcohol, or mental impairment.

the authority to suspend or revoke a license if the nurse "is unable to practice professional nursing with reasonable skill and safety to patients by reason ... of physiological or psychological dependence upon alcohol ... which tend to impair judgment or coordination" and allows the Board to "require a licensee to submit to the care, counseling or treatment of a physician or a psychologist designated by the Board." As part of submitting to treatment, the Board is given the authority under Section 14.1(c) of the Law, 63 P.S. § 224.1(c),[6] to require a licensee as a condition of being allowed to continue to practice to enter a VRP Agreement or face public disciplinary proceedings for his or her alcohol impairment.

 Even if the Board has the authority to require him to enter into the VRP Agreement, Wittorf asserts Brensinger, Jeter, Dr. Feaster, Auchenbach, and Potteiger's testimony established that he is able to practice nursing with reasonable skill and safety to patients. First, those witnesses established no such thing be-

cause the Board found their testimony not credible. Second, and more important, the testimony of those witnesses is not relevant because any argument that he could practice safely was nullified when he entered into the VRP Agreement where he agreed that he could not. Once he entered into the VRP Agreement, he stipulated that he could not practice nursing safely and, by doing so, he waived any argument that his alcohol use did not interfere with patient safety.[7]

Accordingly, the Board's order is affirmed.

## ORDER

AND NOW, this 12th day of October, 2006, it is hereby ordered that the order of the State Board of Nursing, dated January 26, 2006, is affirmed.

b. This disciplinary action is deferred and may ultimately be dismissed pursuant to the impaired professional section of the [Law], 63 P.S. § 224.1, provided [Wittorf] progresses satisfactorily in an approved treatment and monitoring program and complies with the terms and conditions of this [VRP Agreement].

6. Section 14.1(c) of the Law, 63 P.S. § 224.1(c), states as follows:

(c) An impaired professional who enrolls in an approved treatment program shall enter into an agreement with the Board under which the professional's license shall be suspended or revoked but enforcement of that suspension or revocation may be stayed for the length of time the professional remains in the program and makes satisfactory progress, complies with the terms of the agreement, and adheres to any limitations on his practice imposed by the Board to protect the public. Failure to enter into such an agreement shall disqualify the pro-

fessional from the impaired professional program and shall activate an immediate investigation and disciplinary proceedings by the Board.

7. Wittorf also contends that the Board clearly violated his equal protection rights by allowing the Bureau's prosecutor to request that he sign the VRP Agreement under the threat of formal discipline when like members of his class, i.e., second class misdemeanor offenders, are not required to do so pursuant to Section 14(a)(5) of the Law. Wittorf never formally raised an equal protection claim before the Board that it violated his equal protection rights by allowing the Bureau's prosecutor to require him to enter into the VRP Agreement. Because Wittorf raises this issue for the first time on appeal, it is waived. *Lajevic v. Department of State, Bureau of Professional and Occupational Affairs*, 165 Pa. Cmwlth. 310, 645 A.2d 348 (1994) (failure to raise laches issue at the administrative level constituted a waiver).