**G.L., Petitioner**

v.

**STATE ETHICS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 12, 2010.
Decided March 17, 2011.
Reargument Denied May 16, 2011.

Frank R. Bartle and Robert J. Iannozzi, Jr., Lansdale, for petitioner.

John J. Contino, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and McCULLOUGH, Judge, and KELLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

G.L. (Petitioner), a former member and president of a Borough (Borough) Council (Borough Council), petitions for review of the State Ethics Commission's (Commission) Order that denied Petitioner's Motion to Dismiss with Prejudice (Motion) the Ethics Complaint filed against him and of the Commission's Final Adjudication and Order, which found that Petitioner violated Section 1103(a) of the Public Official and Employee Ethics Act (Ethics Act), 65 Pa. C.S. § 1103(a), and directed Petitioner to pay restitution in the amount of $25,000.00

to the Commonwealth of Pennsylvania. In the Ethics Complaint, Petitioner, the owner of a construction company (Company), was accused of violating the Ethics Act by, *inter alia*, using the authority of his public office for private pecuniary gain when he voted to grant final approval on a land development project (Project) in December 2004 and signed certain documents as Borough Council President in June 2005, which allowed the Project, on which Company was involved, to proceed.[1] In the Motion, Petitioner sought to dismiss the Ethics Complaint in its entirety on the basis that the Commission's Investigative Division (ID) violated the strict timeframes of the Ethics Act by issuing an untimely Findings Report. On appeal, Petitioner argues that the Commission erred in: denying the Motion because the ID issued an Amended Findings Report outside the strict time frames set forth in the Ethics Act; and finding that Petitioner violated Section 1103(a) of the Ethics Act.

## I. *Motion to Dismiss*

### A. Factual Background

On or about February 26, 2007, the Commission received an Ethics Complaint against Petitioner alleging, *inter alia*, that, as Borough Council President and a member of the Borough Planning Commission (Planning Commission), Petitioner acted inappropriately with regard to the Project, on which his Company served as general contractor after the Project received final approval from Borough Council. On March 13, 2007, the ID initiated a preliminary inquiry into the Ethics Complaint, which was completed within sixty days of its initiation. On May 7, 2007, the ID sent Petitioner a certified letter advising him that it received an Ethics Complaint

against him and that a full investigation had commenced. The ID requested two 90–day extensions, which the Commission granted. On April 2, 2008, the ID sent Petitioner an amended notice of investigation, informing Petitioner that the allegations set forth in the May 7, 2007, notice were being amended. On April 30, 2008, 359 days after the initiation of the investigation, the ID mailed a Findings Report to Petitioner (Initial Findings Report). The ID then mailed an Amended Findings Report to Petitioner on May 13, 2008 indicating, in relevant part, that "[i]f you have not yet answered the [Initial Findings Report], you only need to file an Answer to the Amended [Findings Report], as it supercedes [sic] the [Initial Findings Report]." (Amended Findings Report at 1, R.R. at 58a.) On June 3, 2008, the Commission granted Petitioner a 30–day extension to file his answer, which he filed on July 14, 2008, along with new matter and a request for a hearing. Thereafter, Petitioner filed the Motion, asserting that the Ethics Complaint should be dismissed based on the ID's failure to comply with the Ethics Act's time frames by issuing the Amended Findings Report more than 360 days after the initiation of the investigation. The Commission held hearings and, on December 29, 2009, mailed both the Order denying the Motion and the Final Adjudication to Petitioner, finding that Petitioner had violated Section 1103(a) and ordering him to pay restitution.

The Commission denied the Motion on the grounds that: (1) the ID's Initial Findings Report was issued within the 360–day period; (2) the Amended Findings Report was only an amendment to the Initial Findings Report, and the Ethics Act does not impose a deadline upon the filing of

---

1. The Commission found that there was insufficient evidence to establish that Petitioner violated Section 1103(a) prior to March 2005 or that Petitioner violated Section 1103(c) of the Ethics Act (related to accepting improper influence). (Final Adjudication Order ¶¶ 2–3.)

amended findings reports; and (3) pursuant to Section 35.48 of the General Rules of Administrative Practice and Procedure (GRAPP), 1 Pa.Code. § 35.48, and *Salters v. Pennsylvania State Police Municipal Officers' Education and Training Commission*, 912 A.2d 347 (Pa.Cmwlth.2006), the Amended Findings Report was properly filed more than five days prior to a hearing. Moreover, the Commission noted that: Petitioner did not argue that the Amended Findings Report included any new allegation or cause of action or otherwise improperly exceeded the scope of the Initial Findings Report; the Amended Findings Report related back to the Initial Findings Report; and there is no basis in the record to conclude that the ID continued to investigate and compile evidence against Petitioner after the 360–day deadline had passed.

## B. Discussion

There is no question that, had the ID not timely issued a Findings Report within the time period set forth in Section 1108(c) of the Ethics Act, 65 Pa.C.S. § 1108(c), this matter would not be before our Court. Thus, the question before us is whether the ID can amend a *timely-filed* Findings Report beyond that time period without violating the Ethics Act. This question appears to be an issue of first impression.

Petitioner argues that the Commission erred in denying the Motion based on its determination that the GRAPP applied and authorized the amendment of the timely-filed Initial Findings Report. Petitioner asserts that the plain language of the Ethics Act precludes the filing of a Findings Report, including any amendment thereto, more than 360 days after the initiation of an investigation and, therefore, the Ethics Act and the GRAPP conflict. According to Petitioner, because the Ethics Act and the GRAPP conflict, the Ethics Act's more restrictive provisions must apply here to preclude the amendment of the Initial Findings Report pursuant to Section 1112 of the Ethics Act, 65 Pa.C.S. § 1112, which provides that "if the provisions of [the Ethics Act] conflict with any other statute, ordinance, regulation or rule, the [Ethics Act] shall control." *See also* Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933 (stating that, where there is a conflict between two statutory provisions, the specific provision controls over the general provision). For its part, the Commission asserts that it properly allowed the ID to issue the Amended Findings Report for the reasons set forth in its decision, i.e., the Ethics Act does not prohibit amending a timely-filed Findings Report, the GRAPP and the Ethics Act do not conflict, and the GRAPP and *Salters* both allow for the amendment of pleadings, such as a findings report.

■ The GRAPP defines the general rules of practice and procedure before Commonwealth agencies, except where an applicable statute provides inconsistent rules or an agency promulgates regulations setting forth rules that are inconsistent with the GRAPP. 1 Pa.Code § 31.1; *Tully v. Department of Public Welfare*, 727 A.2d 1219, 1221 n. 6 (Pa.Cmwlth.1999). Section 35.48 of the GRAPP discusses amendments to pleadings that are filed in administrative agency matters. Specifically, that section provides:

(a) A modification of or supplement to an application, complaint, petition or other pleading shall be deemed as an amendment to the pleading, and shall comply with the requirements of this subchapter relating to the pleading amended insofar as appropriate. Upon its own motion or upon motion promptly filed by a participant, the agency may for good cause decline to permit, or may strike in whole or part, an amendment.

(b) Except as otherwise provided in this subsection, no amendment to a pleading may be filed within 5 days next preceding the commencement of or during a hearing unless directed or permitted by the agency head or the presiding officer after opportunity for all parties to be heard thereon. An amendment in a licensing or certification proceeding which reduces the scope of the application may be filed at any time, if permitted by the agency head or the presiding officer.

1 Pa.Code § 35.48. Sections 35.49 and 35.50 of the GRAPP provide for other types of amendments to the pleadings based on the receipt of evidence at a hearing, or at the direction of the presiding officer during a hearing. 1 Pa.Code §§ 35.49, 35.50. Thus, unless the Ethics Act or the regulations promulgated by the Commission are inconsistent with the above-cited provisions, the GRAPP's amendment provisions would apply.

■ After reviewing the Ethics Act, we agree with Petitioner that the plain language of Section 1108(c) conflicts with the GRAPP's amendment provisions. Because there is a conflict between the Ethics Act and the GRAPP, the Ethics Act's procedures prevail. 65 Pa.C.S. § 1112; 1 Pa. Code § 31.1; *Tully*, 727 A.2d at 1221 n. 6. The procedure and timing for investigations and the filing of certain notices and reports under the Ethics Act is set forth in Section 1108(c), titled "Initiation of investigation." With regard to the timeframe for issuing a Findings Report, that section provides, in relevant part:

The [C]ommission shall, within 180 days of the initiation of an investigation, either terminate the investigation pursuant to subsection (d) or issue a findings report pursuant to subsection (e). Upon a showing by the executive director of the need for extension of this period, the [C]ommission may extend an investigation for up to two 90–day periods, provided that each 90–day extension shall be approved by a majority vote of the members present. In no event shall a findings report be issued later than 360 days after initiation of an investigation. 65 Pa.C.S. § 1108(c).[2] A Findings Report issued under subsection (e) must set "forth the pertinent findings of fact." 65 Pa.C.S. § 1108(e). A Findings Report is defined as "[a]n initial report containing findings of fact as determined by the State Ethics Commission's investigation but not containing any conclusions of law or any determination of whether there has been a violation of law." 65 Pa.C.S. § 1102.

Section 1108 clearly sets forth a deadline for the issuance of a Findings Report, which is the initial report to the Commission setting forth the pertinent findings of fact to support the ID's allegations of violation of the Ethics Act. This Findings Report is to be filed within 180 days of the initiation of the investigation, *unless* the ID's executive director obtains an extension of that time period from the Commission. The ID may request up to two extensions. If such extensions are granted, the ID *must* issue its Findings Report *no later than 360 days* after the initiation of the investigation. Section 1108(c)'s statement that, *"[i]n no event* shall a findings

---

**2.** In addition to the statutory provisions, there are regulations that govern investigations and hearings, such as the filing of an ethics complaint, the initiation of preliminary inquiries, the conduct of an investigation, the conduct of a hearing, and the filing of motions with the Commission. 51 Pa.Code §§ 21.1–21.6, 21.21–21.30. Consistent with the statute, the regulation also requires that a Findings Report be issued either within 180 days after the commencement of the investigation or within the time period of a granted exception, but no later than 360 days. 51 Pa.Code § 21.5.

report be issued later than 360 days after initiation of an investigation," 65 Pa.C.S. § 1108(c) (emphasis added), unambiguously prohibits the filing of *any* Findings Report beyond the 360–day period. When performing statutory interpretation, the object is to ascertain and effectuate the General Assembly's intent. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). "When the words of a statute are clear, there is no need to look beyond the plain meaning of the statute." *Colville v. Allegheny County Retirement Board,* 592 Pa. 433, 444, 926 A.2d 424, 431 (2007).

The Ethics Act does authorize up to two extensions to the issuance of the Findings Report, upon approval of the Commission. This provides the ID a reprieve from the strict 180–day period set forth in the first part of Section 1108(c). In addition, we see no prohibition against the ID amending a Findings Report within the 360–day period set forth in the Ethics Act. However, we cannot deviate from the plain and unambiguous language of Section 1108(c) and sanction an "event" that would allow the ID to issue a Findings Report, even an amended Findings Report, beyond the 360–day period set forth by the Ethics Act. To do so would require this Court to disregard the plain language of Section 1108(c), which we are prohibited from doing under the tenants of statutory interpretation. 1 Pa.C.S. § 1921(b); *Colville,* 592 Pa. at 444,

926 A.2d at 431. Thus, we agree with Petitioner that the Commission erred in permitting the ID to file the Amended Findings Report after the 360–day period had passed.

■ However, we also agree with the Commission that the timely-filed Initial Findings Report contained the necessary factual assertions to support the Commission's ultimate determination. Accordingly, we will affirm the denial of the Motion on other grounds.[3]

The Commission's Final Adjudication concluded, in relevant part, that: (1) Petitioner was a public official subject to the Ethics Act's provisions; (2) Petitioner became involved in the Project sometime around March 25, 2005; (3) after becoming involved in the Project, Petitioner used the authority of his position on Borough Council to sign certain documents that allowed the Project to proceed; and (4) Petitioner obtained a discernable pecuniary gain from the Project of $25,000, the amount the Commission ordered in restitution. An examination of the Initial Findings Report and the Commission's Final Adjudication reveals that the factual averments necessary to support the Final Adjudication were clearly set forth in the Initial Findings Report and supported by the evidence and testimony presented at the hearings. To the extent that the Commission included any of the averments contained in the Amended Findings Report in its findings in the Final Adjudication, no harm resulted from their inclusion as those findings were unnecessary to the Commission's ultimate conclusion.[4] Furthermore, many of

---

3. "[T]his Court may affirm on grounds different than those relied upon by the court or agency below if such grounds for affirmance exist." *Motor Coils MFG/WABTEC v. Workers' Compensation Appeal Board (Bish),* 853 A.2d 1082, 1087 n. 9 (Pa.Cmwlth.2004).

4. For example, the Final Adjudication included several factual findings from the Amended Findings Report related to certain financial dealings between Petitioner's business and Prime Properties, LLC, which received payments for the Project. However, the Commission did not rely on any of those numbers in

these findings were either readily inferable from the allegations contained within the Initial Findings Report or constituted minor changes between the two documents, i.e., substituting "[b]y" for "[i]n or around" or the name of the person filing a contractor/subcontractor form with the Borough. (*Compare* Initial Findings Report Finding of Fact (FOF) ¶¶ 81, 84, R.R. at 36a–37a, to Amended Findings Report FOF ¶¶ 82(a), 86, R.R. at 88a–89a, to Final Adjudication FOF ¶¶ 62(a), 65, R.R. at 407a–08a.) Because we conclude that the allegations contained within the Initial Findings Report support the Commission's Final Adjudication and provided Petitioner with notice of the ID's allegations, we will affirm the Commission's denial of the Motion on these grounds.[5]

## II. *Violation of Section 1103(a) of the Ethics Act*

In the Ethics Complaint, Petitioner was accused of violating the Ethics Act by, *inter alia*, using the authority of his public office for pecuniary gain when he voted to grant final approval on the Project in December 2004 and signed certain documents as Borough Council President in June 2005, which allowed the Project, on which Petitioner's Company was involved, to proceed.

finding that Petitioner violated the Ethics Act or in calculating Petitioner's restitution.

5. The fact that the Amended Findings Report indicated that it superseded the Initial Findings Report has no bearing in this matter. Petitioner received both the Initial Findings Report and the Amended Findings Report and, as the Amended Findings Report merely clarified the allegations contained within or *added* allegations regarding financial matters, Petitioner had the opportunity to and, in fact, did file an answer essentially addressing both Findings Reports.

## A. Factual Background

At all relevant times Petitioner was a member of the Planning Commission and, in April 2003, Petitioner was appointed as a member to the Borough Council. Petitioner was elected to a four-year term on the Borough Council in November 2003. In 2002, a restaurant (Restaurant), of which Petitioner was a patron, began planning the Project—a move from the Restaurant's original location to another location. These plans required numerous reviews by and approvals from the Planning Commission, Borough Council, and the Borough Zoning Hearing Board (ZHB). Between 2002 and 2005, Restaurant went through the land development approval process before each of the three entities, eventually obtaining approval for the Project. Throughout the approval process, Petitioner supported the Project, which ultimately received approval by the Planning Commission and Borough Council on December 6, 2004, and December 29, 2004, respectively.[6] Petitioner voted to approve the plans as both a member of the Planning Commission and as President of Borough Council. Borough Council's approval contained conditions, which Restaurant agreed to comply with in a January 4, 2005, letter. As of January 18, 2005, Restaurant's final plans had not yet been signed by Borough officials.

6. The ZHB granted all but one of the necessary zoning variances on May 3, 2004, and, after Restaurant appealed the denial of the one variance, the Borough's Solicitor and Restaurant negotiated a settlement agreement regarding that variance, which Petitioner signed as President of Borough Council. Borough Council approved the settlement agreement on September 14, 2004, and the Court of Common Pleas of Bucks County approved the agreement on October 12, 2004. Petitioner is neither a member of the ZHB, nor did he participate in the negotiation of the settlement agreement.

Before March 25, 2005, neither Company nor Prime Properties, Inc./Prime Building Group (Prime), another construction company with which Petitioner and Company often worked, had executed a construction agreement with Restaurant for the Project. On March 25, 2005, Prime applied for a contractor/subcontractor registration license with the Borough and Mr. Mortimer, whom Petitioner and Company previously had hired as a foreman, also filed a contractor/subcontractor registration form based on information Mr. Mortimer received from Petitioner. At some time in March 2005, Restaurant advised Petitioner that it would use Company to construct the Project. Petitioner admitted in his Answer that his involvement in the Project commenced on or about March 25, 2005. (Petitioner's New Matter ¶ 2, R.R. at 151a.) On April 15, 2005, Mr. Mortimer submitted a building permit application for the Project on behalf of Prime, which was denied the same day. At that time, Restaurant still had not signed any contract with any construction company to build the Project.

On May 26, 2005, Restaurant submitted final revisions of the Project's plans to the Borough. On June 2, 2005, Petitioner signed, as Borough Council President and member of the Planning Commission, the final plan drawings, called "mylars." On June 14, 2005, Petitioner, as Borough Council President, signed Restaurant's development agreement (Agreement), which must be executed pursuant to the Borough's Subdivision and Land Development Ordinance. The signing of the mylars and Agreement essentially established that Restaurant's final plans complied with all of the conditions Borough Council placed on the Project in its final approval on December 29, 2004, and allowed the construction of the Project to commence. On July 27, 2005, Petitioner provided Restaurant with two undated contracts for Restaurant to sign. The contract named Prime as the contractor on the Project and included costs for constructing the Project discussed between Petitioner and Restaurant. Restaurant's bank issued a cashier's check to Company in the amount of $25,000 on July 27, 2005, which Petitioner deposited in Company's bank account on July 29, 2005. Thereafter, Restaurant signed and returned one of the contracts to Petitioner. The Borough issued a building permit to Mr. Mortimer, on behalf of Prime, to begin construction on the Project on August 8, 2005. Construction on the Project by Company, acting through Prime, began on August 8, 2005, and ended on August 1, 2006. Between December 2005 and August 2, 2006, Restaurant issued multiple payments to Prime, which then forwarded the payments to Petitioner. Additionally, Restaurant issued payments to Prime for construction costs, from which Prime subtracted certain fees and then forward the remaining amounts to Company. Petitioner left Borough Council in December of 2007.

Based on the above facts, the Commission held in the Final Adjudication that, after March 2005, Petitioner became aware that his Company had a contract or a reasonable expectation of performing work on the Project, which required certain Borough Council approvals. Therefore, relying on *Snyder v. State Ethics Commission,* 686 A.2d 843 (Pa.Cmwlth.1996), the Commission concluded that when Petitioner signed the mylars and Agreement for the Project in June 2005, which essentially recognized that the Project's land development plan complied with the conditions set forth by Borough Council and allowed construction to start on the Project, he violated Section 1103(a) by engaging in official business in which he had a conflict of interest.

## B. Discussion

■ Section 1103(a) of the Ethics Act provides that: "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa. C.S. § 1103(a). In pertinent part, the Ethics Act defines "conflict of interest" as "[u]se by a public official ... of the authority of his office or employment ... for the private pecuniary benefit of himself, ... or a business with which he ... is associated." 65 Pa.C.S. § 1102. Section 1102 defines "authority of office" as "[t]he actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment." *Id.*

■ The Commission bears the burden of proving a violation of the Ethics Act. *Pulice v. State Ethics Commission*, 713 A.2d 161, 162 (Pa.Cmwlth.1998). In order to find a violation of the Ethics Act, at least four members of the Commission must find clear and convincing proof of a violation. Section 1108(g) of the Ethics Act, 65 Pa.C.S. § 1108(g). Clear and convincing proof is evidence that is so clear, direct, weighty, and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue. *In re Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998). Thus, in order to prove a violation, the Commission must establish by clear and convincing proof that: (1) a public official (2) used the authority of his office (3) for the private pecuniary gain of himself or a business with which he is associated.

There is no question that, when he signed the Project's mylars and Agreement, Petitioner was a public official subject to the Ethics Act or that the Company, which Petitioner owns, received pecuniary gain from the Project. Thus, the question before this Court is whether Petitioner's signing of the mylars and the Agreement was a use of the authority of Petitioner's office, such that Petitioner had a conflict of interest. Based on our precedent, we must agree with the Commission that the signing of the mylars and Agreement was the use of the authority of Petitioner's office.

In *Snyder*, relied upon by the Commission to find that Petitioner violated Section 1103(a) of the Ethics Act, this Court upheld the Commission's finding that an official violated Section 3(a) of the former Ethics Law (Prior Law), *formerly* 65 P.S. § 403(a)[7] (related to conflicts of interest), by *inter alia*, voting to approve a "final development plan" for a particular project in which he had a pecuniary interest. *Id.*, 686 A.2d at 848. The official argued that his vote did not violate the Prior Law in that the vote was irrelevant because, once the Board approved the preliminary plan, the Board was then required to approve the conforming final plan. *Id.* at 849. We held that conflicts of interest were still possible after preliminary approval has been granted, noting that, "although the Board must approve a final plan which conforms to the preliminary plan, the Board must first determine whether the final plan does, indeed, conform." *Id.* Therefore, because conflicts of interest were still possible and present in *Snyder*, we concluded that the Commission's finding that the official violated Section 3(a) of the Prior Law was proper. *Id.* The facts here are similar to those in *Snyder*, except that instead of voting on final approval

7. Act of June 26, 1989, P.L. 26, 65 P.S. § 403(a), *repealed by* Section 6(a)(2) of the Act of October 15, 1998, P.L. 729.

454

after preliminary approval, Petitioner actually signed the mylars and Agreement in his role as Borough Council President.

Petitioner argues that the Commission erred in relying on *Snyder* to find that he violated the Conflict of Interest provision, Section 1103(a), of the Ethics Act. According to Petitioner, *Snyder* is distinguishable because, unlike the official in *Snyder*, Petitioner was not involved in the Project when Borough Council deliberated and voted on approving the Project between 2003 and December 2004. Additionally, Petitioner asserts that his signing of the mylars and Agreement in June 2005 did not violate Section 1103(a) because such actions do not constitute the use of the authority of his office as defined by the Ethics Act. According to Petitioner, the signing of the Agreement and mylars, once it was determined that those items were in compliance with the conditions imposed by Borough Council, did not involve the use of the authority of his office, but was a mandatory, obligatory, ministerial duty under the law. Moreover, given Borough Council's final approval of the Project, the signing of the mylars and Agreement would have taken place anyway. Accordingly, Petitioner argues that his actions did not violate Section 1103(a) of the Ethics Act.[8]

Although Petitioner argues that signing the mylars and Agreement was merely ministerial and obligatory because Borough Council had already granted approval in December 2004, Petitioner's argument is similar to the one asserted by the official, and rejected by this Court, in *Snyder*. It is undisputed that the December

2004 approval was subject to conditions. Indeed, Petitioner acknowledges that between the Project's approval and his signing of the documents in June 2005, Restaurant had to "revis[e] the plan to ensure compliance with the accepted conditions of approval." (Petitioner's Br. at 24.) Until those revisions were made, reviewed, *and approved* as compliant, the Project could not go forward. In signing the mylars and Agreement, Petitioner, like the official voting for final approval in *Snyder*, essentially made the determination that the revised mylars and Agreement did, in fact, comply with the conditions placed on the Project's approval.

This conclusion is supported by the testimony of the Borough's Zoning Officer/Building Inspector (ZO/BI), who stated that, pursuant to the Borough Subdivision and Land Use Ordinance and the Pennsylvania Municipalities Planning Code,[9] Borough Council's December 2004 approval was not an absolute guarantee for the Project to go forward because there were conditions imposed. (Hr'g Tr. at 146–47, March 3, 2009, R.R. at 191a.) According to the ZO/BI, before the Project could move forward and have building permits issued, the mylars had to be signed by a member of Borough Council and the Agreement had to be signed by a representative of the Borough, such as a member of Borough Council, which would evidence that the necessary conditions were satisfied. (Hr'g Tr. at 156–57, 165, 190, R.R. at 193a, 195a, 202a.) Consequently, by signing these documents, Petitioner took affirmative actions in his official capacity that facilitated

8. In his brief, Petitioner also argues that he did not violate the Ethics Act because "at the time Council voted to approve the project, [he] was neither involved in the project, nor received any financial consideration for his vote of approval...." (Petitioner's Br. at 21.) The Commission concluded that Petitioner did not violate the Ethics Act in his actions

prior to March 2005, (Final Adjudication Order ¶ 1), and Council voted to approve the project prior to March 2005. Therefore, we do not address this argument.

9. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202.

the commencement of construction on the Project and his Company's receipt of pecuniary benefits. Therefore, we conclude that the Commission did not err in finding that Petitioner violated Section 1103(a) of the Ethics Act.[10]

## III. Conclusion

Although we disagree with the Commission that the ID could issue an Amended Findings Report more than 360 days after the initiation of the investigation, we affirm the Commission's denial of the Motion because the necessary factual allegations to support the Commission's Final Adjudication were contained in the Initial Findings Report. Moreover, the Commission did not err in finding that Petitioner violated Section 1103(a) of the Ethics Act by signing the mylars and Agreement for a construction project with which Company was involved. Accordingly, we affirm the Commission's Orders.

### ORDER

**NOW,** March 17, 2011, the Order of the State Ethics Commission (Commission) that found that G.L. violated Section 1103(a) of the Official and Employee Ethics Act (Ethics Act), 65 Pa.C.S. § 1103(a), in the above-captioned matter is hereby **AFFIRMED,** and the Commission's Order denying G.L.'s Motion to Dismiss is **AFFIRMED ON OTHER GROUNDS.**

**10.** Moreover, it appears that Petitioner believed that his Company's involvement in the Project presented at least the appearance of impropriety or a violation of the Ethics Act. Otherwise, there would have been no need, beginning in March 2005, to run the Project through Prime. Indeed, it appears that Petitioner expended a great amount of effort in preventing Company's involvement with the Project from becoming public knowledge both before he signed the mylars and the Agreement, which authorized the commencement of Company's construction on the Project, and afterward.